UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

  v.

KEVIN DENNIS GOLDEN,

        Defendant.

No. 2:13-cr-00115-GEB

**ORDER DENYING MOTION TO SUPPPRESS**

Defendant moves for suppression of "all evidence . . . obtained as a result of" what he contends was a "warrantless law enforcement action in this case[,] and all fruits thereof[,] on the grounds such action violated [Defendant's] right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment of the United States Constitution." (Def.'s Mot. to Suppress (Def.'s Mot.") 1:21-27, ECF No. 17.) Further, Defendant "requests an evidentiary hearing at which evidence will be presented in support of [his] challenge." (Id. at 3:6-8.)

The government opposes Defendant's motion and contends "[t]here are no disputed issues of material fact that would warrant an evidentiary hearing." (Gov't Opp'n 17:1-2, ECF No. 19.)

Defendant supports his request for an evidentiary hearing by arguing in his brief that at an evidentiary hearing, he "will . . . establish[] that [he] did not give verbal consent

1

to search his effects, and also, that any purported consent was involuntary." (Def.'s Mot. 11:19-20.)

"'An evidentiary hearing on a motion to suppress need be held only when the moving papers [contain] facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist.'" United States v. McTiernan, 695 F.3d 882, 891 (9th Cir. 2012) (quoting United States v. Quoc Viet Hoang, 486 F.3d 1156, 1163 (9th Cir. 2007)). Further, "[a] hearing is not required on a motion to suppress if the grounds for suppression consist solely of conclusory allegations of illegality." United States v. Ramirez-Garcia, 269 F.3d 945, 947 (9th Cir. 2001).

Defendant's request for an evidentiary hearing is denied since the evidentiary record evinces his request is based solely on conclusory arguments and allegations of illegality in his brief.

## I. BACKGROUND

The evidentiary record evinces the following:

In early December 2012, the United States Department of Homeland Security ("DHS") was investigating an aircraft, a single engine Cessna C210 ("Cessna"). (Decl. of Special Agent Kristopher Kashuba ("Kashuba Decl.") ¶ 4, Gov't Ex. 2, ECF No. 19 pp. 31-33.) When DHS learned the Cessna would be flying into Lincoln, California on December 14, 2013, the following DHS Special Agents determined they "would monitor the airplane, make contact with the pilot, . . . and conduct a ramp check[1]": Kristopher Kashuba,

---

[1]    "A ramp check, authorized by . . . federal law, permits officers of the Federal Aviation Administration ("FAA") or [other law enforcement officers] to examine the pilot's and aircraft's licensing and certification to ensure that

1  Joshua Wood, and Daniel Mercado. (Id. at ¶¶ 4-5.) Prior to
2  December 14, 2012, DHS "had no information that any other
3  individuals were involved with the [Cessna] and, thus had no
4  reason to investigate anyone other than the pilot." (Id. at ¶ 5.)

5          On December 14, 2012, Special Agents Kashuba, Wood, and
6  Mercado "worked in plainclothes and drove unmarked police cars to
7  the Lincoln Airport." (Id. at ¶ 6.) When they arrived at the
8  airport, "the [Cessna] had already landed and was parked near the
9  refueling station." (Id.) Kashuba "parked [his] vehicle
10 approximately seventy-five yards away from the airplane." (Id.)
11 Wood "parked in the parking lot across the street from the
12 airport." (Decl. of Special Agent Joshua Wood ("Wood Decl.") ¶ 6,
13 Gov't Ex. 3, ECF No. 19 pp. 35-48.) Mercado "parked just outside
14 the gate of the airport." (Decl. of Special Agent Daniel Mercado
15 ("Mercado Decl.") ¶ 3, Gov't Ex. 4, ECF No. 19 pp. 40-42.)

16         Kashuba and Wood observed a male, who was later
17 determined to be the pilot walk around the airplane and then into
18 the pilots' lounge.[2] (Kashuba Decl. ¶ 6; Wood Decl. ¶ 6; CAM3
19 Surveillance Video ("CAM3") 16:16:30-16:18:50, Gov't Ex. 5; CAM1
20 Surveillance Video ("CAM1") 16:19:00-16:19:08, Gov't Ex. 6.)
21 Kashuba and Wood then saw a white Ford truck/SUV "pull up to the
22 [Cessna]." (Kashuba Decl. ¶ 6; Wood Decl. ¶ 6; CAM3 16:48:18-

23 _____
   they conform to FAA regulations." United States v. Zukas, 843 F.2d 179, 181
24 (5th Cir. 1988); see 14 C.F.R. § 61.3(1)(3) ("Each person who holds an airman
   certificate, medical certificate, authorization, or license as required by
25 this part must present it and their photo identification . . . for inspection
   upon a request from: . . . [a]ny Federal, State, or local law enforcement
26 officer. . . ."); 49 U.S.C.A. § 44103(d) ("An operator of an aircraft shall
   make available for inspection a certificate of registration for the aircraft
27 when requested by a United States Government, State, or local law enforcement
   officer.").
   [2]     Mercado could not see the Cessna from his vantage point, parked outside
28 of the airport gate. (Mercado Decl. ¶ 3.)

                                    3

16:49:15.) The driver of the Ford, who was later identified as the Defendant, exited the Ford, opened the tailgate, and moved some luggage from the Ford into the Cessna. (Kashuba Decl. ¶ 6; Wood Decl. ¶ 6; CAM3 16:49:00-16:55:25.) Defendant then drove out of the airport, parked the Ford in the parking lot across from the airport about ten to fifteen feet from Wood, exited the Ford, and walked back to the airplane. (Kashuba Decl. ¶ 6; Wood Decl. ¶ 6; CAM1 16:56:10-16:56:55, 16:58:45-17:02:20; CAM3 16:55:25-16:56:10, 17:02:30-17:04:00.)

At this point, Wood walked toward the airport's front gate to let in Lincoln Police Department Officer Collins. (Wood Decl. ¶ 7.) Officer Collins was in uniform with his badge and firearm exposed. (Id.) Wood and Collins then joined Kashuba and Mercado. (Id.) Kashuba, Mercado, Wood, and Collins approached Defendant. (Id.; Kashuba Dec. ¶ 7; Mercado Decl. ¶ 5.) Kashuba and Mercado were standing approximately ten to twelve feet away from Defendant, and Collins and Wood "stood in the background." (Wood Decl. ¶ 7; Mercado Decl. ¶ 3.) Kashuba and Mercado told Defendant they were with DHS, indicated they desired to conduct a "ramp check" and asked where they could find the Cessna's pilot. (Kashuba Decl. ¶ 7; Mercado Decl. ¶ 3; Wood Decl. ¶ 7.) Defendant indicated the pilot was in the pilots' lounge. (Kashuba Decl. ¶ 7; Mercado Decl. ¶ 3; Wood Decl. ¶ 7.) During this encounter, "everyone remained calm and relaxed. There was no physical touching and no threats made by anyone." (Wood Decl. ¶ 7.)

Kashuba and Wood walked toward the pilots' lounge, made contact with other local law enforcement officers at the gate, and entered the lounge. (Kashuba Decl. ¶ 7; Wood Decl. ¶ 8; CAM1

4

17:09:00-17:13:30.) Mercado asked Defendant "whether he would be willing to help [them] identify the pilot in the lounge[, and] Defendant kindly accommodated [Mercado's] request and walked over to the lounge with [Mercado]." (Mercado Decl. ¶ 3; CAM1 17:13:30-17:13:55.) Mercado did not order Defendant to comply with his request. (Mercado Decl. ¶ 3.) Mercado and Defendant entered the lounge approximately thirty seconds behind Kashuba and Wood. (CAM1 17:13:20 – 17:13:55.)

As Mercado and Defendant entered the lounge, Mercado saw Kashuba and Wood speaking to the pilot, James Hansen, and Mercado joined the conversation. (Mercado Decl. ¶ 4.) The agents asked Hansen for his documentation to conduct a ramp check. (Kashuba Decl. ¶ 8; Wood Decl. ¶ 8; Mercado Decl. ¶ 4.) Hansen was cooperative and complied. He handed the agents some documentation and stated additional documentation was in the Cessna. (Kashuba Decl. ¶ 8; Wood Decl. ¶ 8; Mercado Decl. ¶ 4.) The agents asked Hansen if they could search the Cessna, and Hansen allowed the agents to do so. (Kashuba Decl. ¶ 8; Wood Decl. ¶ 8; Mercado Decl. ¶ 4.) While the agents were talking to Hansen, Defendant "carried on with his own business, walking back and forth inside of the lounge." (Wood Decl. ¶ 8.) None of the agents spoke to Defendant while inside the lounge. (Kashuba Decl. ¶ 8; Mercado Decl. ¶ 5.)

Kashuba and Wood left the pilots' lounge to search the Cessna, and Mercado stayed behind with Hansen and Defendant in the lounge. (Mercado Decl. ¶ 4; CAM1 17:15:20-17:16:00.) Defendant then left the lounge. (Mercado Decl. ¶ 5; CAM1 17:18:10-17:19:05.) Hansen and Mercado remained in the lounge for

approximately ten minutes, at which point, they walked outside
and joined . . . Kashuba and Wood at the [Cessna]." (Mercado
Decl. ¶ 5; CAM1 17:25:25-17:25:45.) Video surveillance shows
Defendant walking outside of the airport, alone, during this
time. (CAM1 17:18:10 - 17:19:05; CAM2 Surveillance Video ("CAM2")
17:20:35 - 17:28:30, Gov't Ex. 7.)

When Kashuba and Wood opened the door to the Cessna,
they immediately saw the suitcases they observed Defendant load
onto the plane. (Kashuba Decl. ¶ 9; Wood Decl. ¶ 9.) Once Hansen
and Mercado arrived at the Cessna, Wood asked Hansen questions
about the luggage and what he did for a living. (Wood Decl. ¶ 9;
Mercado Decl. ¶ 5.) Wood then asked if he could look inside a
suitcase, and Hansen "responded that they were the Defendant's."
(Wood Decl. ¶ 9.) Mercado then looked for Defendant and "found
him behind the [pilots'] lounge, in an empty field, approximately
fifty yards from the airplane." (Mercado Decl. ¶ 6; CAM1
17:27:12-17:27:40; CAM2 17:20:35 - 17:28:30.) Mercado "asked
Defendant whether he could help . . . confirm whether the bags in
the [Cessna] belonged to him." (Mercado Decl. ¶ 6.) Defendant
"stated that was not a problem and walked with [Mercado] to the
airplane." (Id.) Once at the Cessna, Wood "asked Defendant if the
bags belonged to him and [Defendant] responded that they did."
(Id. at ¶ 7.) Wood then asked Defendant if he could look inside
one of his bags, and Defendant stated: "no problem" and "go
ahead." (Wood Decl. ¶ 9; Mercado Decl. ¶ 7.) During this
conversation between Wood and Defendant, "Defendant was calm and
. . . Wood addressed him politely and professionally. There was
no authoritative tone used, no physical touching, and no

threats." (Mercado Decl. ¶ 7.)

Upon opening the suitcase, the agents discovered many vacuum sealed bags, which appeared to contain marijuana. (Kashuba Decl. ¶ 9; Wood Decl. ¶ 10; Mercado Decl. ¶ 7.) Defendant was subsequently arrested. (Wood Decl. ¶ 10; Affidavit of Special Agent Kristopher Kabusha in Supp. of Criminal Compl. ¶ 12, Gov't Ex. 1, ECF No. 19 pp. 25-29.)

On December 14, 2012, during their encounter with Defendant, Mercado and Kashuba each had a firearm, but at no time drew, brandished, displayed, or otherwise reached for their firearm. (Kashuba Decl. ¶ 7; Mercado ¶ 3.) Wood exposed his firearm and badge briefly to Defendant as he first approached him, but never drew, brandished, or otherwise reached for his firearm. (Wood Decl. ¶ 7.) Lincoln Police Officer Collins was in uniform and had his badge and firearm exposed, but never drew, brandished, or otherwise reached for his firearm. (Id.)

## II. DISCUSSION

Defendant "asserts he was not lawfully detained in the first instance and that his continued seizure was unduly prolonged, ripening into a defacto arrest without sufficient justification and vitiating any purported consent [to search his luggage]." (Def.'s Mot. 6:5-7.)

### A.   The Nature of Defendant's Interaction with Law Enforcement

Defendant argues he was seized when initially contacted by law enforcement officers at the Lincoln Airport and that insufficient cause existed for the seizure. (Id. 6:13-8:3.) Specifically, Defendant argues:

> A person is seized under the Fourth
> Amendment when they would not feel free to
> leave in light of all the surrounding
> circumstances. . . .
>
> . . . .
>
> Given that the several agents were
> clearly armed, demanded inspection of the
> plane, and failed to inform [Defendant] that
> he was free to leave (because he was not), no
> reasonable person would feel they could
> simply go about their business (which, here,
> would involve getting in the plane and taking
> flight). That one in such a situation would
> feel free to do so is nonsensical.

(Id. at 6:14-7:7.)

The government rejoins that "[t]he encounter between Defendant and the agents was not a seizure, but rather a consensual encounter." (Gov't Opp'n 7:27-8:1.) The government argues:

> Even without reasonable suspicion, a law
> enforcement officer may approach an
> individual, ask him for identification, ask
> him questions, and request consent to search
> him without implicating the Fourth Amendment,
> as long as the police officer does not
> communicate to the individual that compliance
> is required. The Court must look at the
> totality of the circumstances surrounding the
> encounter and determine whether a reasonable
> person in the same circumstances would feel
> that he was not at liberty to ignore the
> police and go about his business.

(Id. at 6:15-24 (internal quotation marks and citation omitted).)

The government further argues:

> Here, the agents approached Defendant
> politely, asked him where the pilot was
> located, and requested his help to identify
> the pilot and the bags in the plane. At one
> point, Defendant voluntarily left the lounge
> to use his phone. The encounter was not
> coercive or confrontational. There was no
> overwhelming application of force, no
> brandishing of weapons, no blocking of exits,

> and no threat. Under these circumstances, there was no seizure.

(Id. at 11:19-24.)

"The first question that . . . must [be] answer[ed] is whether [the law enforcement officer's interaction] with Defendant was a seizure or, instead, was voluntary and consensual." United States v. Crapser, 472 F.3d 1141, 1145 (9th Cir. 2007). "When an encounter is voluntary, no constitutionally protected right is implicated." United States v. Summers, 268 F.3d 683, 686 (9th Cir. 2001).

"Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." United States v. Drayton, 536 U.S. 194, 200 (2002).

> Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means. If a reasonable person would feel free to terminate the encounter, then he or she has not been seized.

Id. at 201; accord United States v. Washington, 490 F.3d 765, 770 (9th Cir. 2007) (stating "[n]o Fourth Amendment seizure occurs when a law enforcement officer merely identifies himself and poses questions to a person if the person is willing to listen[,]" and "it is clear that the permissible questions may include a request for consent to search"). "The reasonable person test . . . is objective and 'presupposes an innocent person.'" Drayton, 536 U.S. at 202 (quoting Florida v. Bostick, 501 U.S.

1   429, 437-38 (1991).)

2   "The totality of the circumstances determines whether a

3   person was [seized]." United States v. Redlightning, 624 F.3d

4   1090, 1103 (9th Cir. 2010). The Ninth Circuit has recognized a

5   number of factors as relevant to this inquiry, including: "'the

6   language used to summon the individual; the extent to which the

7   defendant is confronted with evidence of guilt; the physical

8   surroundings of the interrogation; the duration of the detention;

9   and the degree of pressure applied to detain the individual." Id.

10  at 1103 (quoting United States v. Hayden, 260 F.3d 1062, 1066

11  (9th Cir. 2001)) (numbering omitted). Other factors include:

12          the number of officers; whether weapons were
            displayed; whether the encounter occurred in
13          a public or non-public setting; whether the
            officer's tone or manner was authoritative,
14          so as to imply that compliance would be
            compelled; and whether the officers informed
15          the person of his right to terminate the
            encounter.
16

17  Washington, 490 F.3d at 771-72 (numbering omitted).

18          Here, the totality of the circumstances evinces

19  Defendant was not "seized" within the meaning of the Fourth

20  Amendment until he was formally arrested after his luggage was

21  searched. Defendant's encounter with law enforcement occurred in

22  the late afternoon/early evening at a regional airport, in view

23  of others. Although Defendant was initially approached by four

24  law enforcement personnel, Defendant interacted only with one DHS

25  Agent the majority of time, either Mercado or Wood. See Crasper,

26  472 F.3d at 1146 (finding an encounter with law enforcement was

27  consensual, not a seizure, stating: "Although there were four

28  officers present, most of the time only two talked to [the

1  d]efendnat, while two talked to [another person], and part of the
2  time only [one officer] was with [the d]efendant"). Further,
3  "[a]lthough the [DHS agents and police officer] were armed, they
4  made no effort to draw Defendant's attention to their weapons."
5  Id.; see also Drayton, 536 U.S. at 205 ("The presence of a
6  holstered firearm . . . is unlikely to contribute to the
7  coerciveness of the encounter absent active brandishing of the
8  weapon.").

9       Defendant "voluntarily agreed to [help identify the
10 pilot and answer questions concerning his luggage]."
11 Redlightning, 624 F.3d 1090, 1103. The agents "did not demand
12 that [Defendant do these things]; they asked." Crapser, 472, F.3d
13 at 1146. "There was no application of force, no intimidating
14 movement, no overwhelming show of force . . . no blocking of
15 exits, no threat, no command, not even an authoritative tone of
16 voice." Drayton, 536 U.S. at 204. The DHS agents and police
17 officer "did not . . . suggest that [Defendant] could not leave .
18 . ., or affirmatively assert authority over [his] movements." Id.
19 To the contrary, Defendant can be seen on surveillance video
20 walking unaccompanied outside of the pilots' lounge for
21 approximately ten minutes. Moreover, although Defendant was not
22 told he was free to leave, "[t]he absence of explicitly informing
23 [Defendant] that he . . . [wa]s free to leave is not a
24 dispositive factor." Redlightning, 624 F.3d at 1103.

25       Since the record shows "a reasonable person would
26 [have] fe[lt] free to terminate the encounter," Defendant was not
27 seized. Drayton, 536 U.S. at 201.

28

**B.    Whether Defendant Consented to the Search of His Luggage**

Defendant argues he "was reportedly asked for consent well after the unreasonable seizure of his body and his effects. Thus, any purported consent was the direct result of the illegal and prolonged detention." (Def.'s Mot. 10:12-15.) Defendant further argues that "through an evidentiary hearing, . . . it will be established that [he] did not give verbal consent to search his effects." (Id. at 11:17-21.)

The government rejoins that the test for consent "is one of objective reasonableness, requiring the court to consider the totality of the circumstances[,]" and "[b]ecause the totality of the circumstances weigh[s] in favor of voluntariness, Defendant's consent was voluntary and the search of his luggage was valid." (Def.'s Opp'n 12:3-8, 14:22-23.)

"'[A warrantless] search conducted pursuant to a valid consent is constitutionally permissible.'" United States v. Brown, 563 F.3d 410, 415 (9th Cir. 2009) (alteration in original) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973)). "The government bears the burden of proving that consent was voluntary." Id.

"Whether consent to search was voluntarily given is 'to be determined from the totality of all the circumstances.'" Id. (quoting Schneckloth, 412 U.S. at 227). The Ninth Circuit has identified five factors that are relevant in determining voluntariness:

> (1) whether the [consenting individual] was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the [consenting individual] was notified that she

12

had a right not to consent; and (5) whether the [consenting individual] had been told a search warrant could be obtained.

Id. (alteration in original) (quoting Washington, 387 F.3d at 1068).

"These factors serve merely as guideposts, 'not [as] a mechanized formula to resolve the voluntariness inquiry.'" Id. (quoting United States v. Patayan Soriano, 361 F.3d 494, 502 (9th Cir. 2004)). "[N]o one factor is determinative." Id. Further, "[i]n circumstances such as these, where the question of voluntariness pervades both the search and seizure inquiries, the respective analyses turn on very similar facts." Drayton, 536 U.S. at 206.

Here, Wood avers that he "asked [Defendant] whether [he] could look inside one of his suitcases and [Defendant] stated 'no problem' and 'go ahead.'" (Wood Decl. ¶ 9; see also Mercado Decl. ¶ 7.) During this exchange, Defendant was not in custody, and none of the law enforcement officers had their weapons drawn. Further, no one told Defendant that a search warrant could be obtained. "Although [no law enforcement officer] inform[ed] [Defendant] of [his] right to refuse the search . . . the totality of the circumstances indicates that [Defendant's] consent was voluntary, so the search[] w[as] reasonable." Drayton, 536 U.S. at 207.

Since Defendant was not "seized" until he was arrested after his luggage was searched, and he voluntarily consented to the search, Defendant's motion to suppress is denied.

///

///

13

1

2          **III. CONCLUSION**

3          For the stated reasons, Defendant's suppression motion

4 is denied. Further, since Defendant has not shown that an

5 evidentiary hearing should be scheduled, the hearing on

6 Defendant's suppression motion scheduled to commence at 9:00 a.m.

7 on December 20, 2012 for argument, is converted to a status

8 hearing.

Dated:  December 18, 2013

9

10

11    _____

GARLAND E. BURRELL, JR.

12    Senior United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28